1

2

3

4

5

6

7

8                     IN THE UNITED STATES DISTRICT COURT

9                   FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   KAREN MITCHELL, et al.,                    CASE NO. CV F 10-1405 LJO DLB

12                     Plaintiff,               **SUMMARY JUDGMENT DECISION**
            vs.                                 (Doc. 31.)
13
     COUNTY OF MADERA, et al.,
14
                      Defendants.
15   _____/

16                            **INTRODUCTION**

17          Defendants County of Madera ("County") and County District Attorney Michael Keitz ("Mr.

18   Keitz") seek summary judgment on plaintiff Karen Mitchell's ("Ms. Mitchell's") First Amendment

19   retaliation claims in that as a "policymaker" of the County District Attorney's Office ("DA's office"),

20   Ms. Mitchell lacked "typical" First Amendment protections to defeat Ms. Mitchell's claims.  Ms.

21   Mitchell responds that she was not a policymaker, especially considering her reduced duties and

22   responsibilities after Mr. Keitz became the County District Attorney.  This Court considered the County

23   and Mr. Keitz' (collectively "defendants'") summary judgment motion on the record[1] and VACATES

24   _____

25          [1]      This Court carefully reviewed and considered the record, including all evidence, arguments, points and
     authorities, declarations, testimony, statements of undisputed facts and responses thereto, objections and other papers filed
26   by the parties.  Omission of reference to evidence, an argument, document, objection or paper is not to be construed to the
     effect that this Court did not consider the evidence, argument, document, objection or paper.  This Court thoroughly reviewed,
27   considered and applied the evidence it deemed admissible, material and appropriate for summary judgment.  This Court does
     not rule on objections in a summary judgment context, unless otherwise noted.
28

                                             1

the October 19, 2011 hearing, pursuant to Local Rule 230(g).  For the reasons discussed below, this Court DENIES defendants summary judgment.

## BACKGROUND

### Summary

During 1995-2002, Ms. Mitchell served as a Deputy District Attorney ("DDA") with the DA's office.  Former County District Attorney Ernie LiCalsi ("DA LiCalsi")[2] recruited Ms. Mitchell to return to the DA's office as a Supervising Deputy District Attorney ("SDDA"), and Ms. Mitchell returned to that position in 2006 after having worked in the San Diego City Attorney's Office.  Ms. Mitchell alleges that during late 2009, Ms. Mitchell publicly supported the candidacy of Mr. Keitz' potential opponent and that Mr. Keitz took adverse employment actions against Ms. Mitchell to culminate in her forced retirement.  Ms. Mitchell pursues a 42 U.S.C. § 1983 ("section 1983") claim that defendants engaged in First Amendment retaliation against Ms. Mitchell.  Defendants seek summary judgment on Ms. Mitchell's First Amendment retaliation claim in that as a policymaker, she was "subject to partisan demotion or dismissal."  If granted summary judgment on Ms. Mitchell's First Amendment retaliation claim, defendants request that this Court decline to exercise supplemental jurisdiction over Ms. Mitchell's remaining California statutory claims.  Ms. Mitchell disputes that her SDDA work qualified her as a policymaker and contends that her First Amendment retaliation claim survives summary judgment.

### Distinctions Between Assistant District Attorney and SDDA

During his tenure, DA LiCalsi had the option to manage the DA's office with an Assistant District Attorney ("ADA") and two SDDAs or with three SSDA's and not ADA.  During 2005-2008, DA LiCalsi utilized three SSDA's, including Ms. Mitchell.  The County provides separate job descriptions for an ADA and SSDA.

The ADA job description includes:  "Assists in planning, directing, managing, and overseeing the functions, operations, and programs of the District Attorney's Office; develops and administers

---

[2] DA LiCalsi left the DA's office after he was elected in 2008 as a Madera County Superior Court Judge. Since most of the relevant events arose during DA LiCalsi's tenure as District Attorney, this Court will refer to him as DA LiCalsi rather than Judge LiCalsi.

assigned budgets, prepares budget requests, and controls expenditures; selects, directs, supervises, trains, and evaluates assigned staff . . . may assign projects to investigators . . . makes recommendations on . . . disposition of files . . . handles specialized legal assignments; directs investigations by law enforcement officials . . . represents the District Attorney's office with the public and other government agencies; handles investigations relating to personnel problems and complaints; serve as the District Attorney upon the request or absence of the District Attorney."

The SDDA job description includes: "Assists with planning, directing and overseeing the functions, operations and programs in the area of assignment; directs, supervises, trains and evaluates assigned staff . . . makes recommendation on . . . disposition of files . . . provides advice on search and seizure and development of evidence to local law enforcement personnel; handles difficult and specialized legal assignments; and directs investigations by law enforcement officials."

Ms. Mitchell notes that under County ordinances, County employees are part of the "civil service system" unless specifically excluded and that as to the DA's office, only the District Attorney and an "assistant department head" appointed by the County Board of Supervisors are specifically excluded. Ms. Mitchell concludes that SSDA's "are protected by Civil Service."

County ordinances provide that "[d]isciplinary action may be taken against any employee only for good cause . . ." and entitle employees to due process protections prior to discipline.

**Ms. Mitchell's Duties During DA LiCalsi's Tenure**

Ms. Mitchell supervised clerical staff and investigators, prosecuted child and infant homicides, sexual assault and domestic violence cases, and sexual predator, agriculture and high profile crimes, worked with the County Gang Task Force, attended hearings for prisoners sentenced to life, oversaw and monitored DA's office attorney training, obtained accreditation for mandatory continuing legal education ("MCLE") for the DA's office, was in charge of parole hearings, and acted as a liaison with other agencies.

In her declaration, Ms. Mitchell states that DA LiCalsi "assigned me a portion of the budget to draft, but I did not 'make budget requests or control expenditures,' except insofar as such activities were a part of the specific job duties assigned to me by DA LiCalsi." Ms. Mitchell further declares that each SDDA was "assigned to interface with specific governmental entities, but this task was (a) assigned by

3

LiCalsi and (b) limited to only those entities to which [the SDDA] had been assigned."  Ms. Mitchell describes her employee training as limited to employees "assigned" to her by DA LiCalsi to train and she never selected assigned staff.

In her deposition, Ms. Mitchell testified that during the last year of DA LiCalsi's tenure, she considered her work equivalent to an ADA.  Ms. Mitchell declares that during DA LiCalsi's last year, the SSDA's, including her, handled "more of the personnel maters, but LiCalsi remained involved and responsible for such matters."

DA LiCalsi testified that he considered appointing Ms. Mitchell as an ADA but declined until fellow SDDA D. Jones ("Ms. Jones") was appointed as a Superior Court Judge because he "didn't want it to be a slap in the face to D Jones."[3]  DA LiCalsi also testified that he was concerned that his successor as District Attorney may demote Ms. Mitchell if she were an ADA.

### Mr. Keitz' Selection As District Attorney

After DA LiCalsi's 2008 election as Superior Court Judge, the County Board of Supervisors solicited applications to replace DA LiCalsi.  Ms. Mitchell and two other DA's office attorneys, Mr. Keitz and Cliff Kemper, applied.  DA LiCalsi wrote a letter to each member of the County Board of Supervisors to recommend Ms. Mitchell, whom he considered a better trial attorney than Mr. Keitz.  The County Board of Supervisors selected Mr. Keitz, who took office in January 2009.

### Ms. Mitchell's Reassignment And Duty Changes

Ms. Mitchell was reassigned in summer 2009 and declares:

> After Michael Keitz took office in early January of 2009, he acted swiftly to remove from me any job duty I had that involved working on budgets or meeting with other governmental entities or making recommendations about hiring, firing, promotion and demotion.  Mr. Keitz rejected any suggestions that I had concerning the office.
>
> In the Summer of 2009, Mr. Keitz assigned me to welfare fraud.  He had previously taken away several major cases that I had been working on, including three murder trials.  Before he assigned me to welfare fraud, the welfare fraud assignment had been handled by Deputy District Attorneys.  After I was assigned to welfare fraud I no longer had any supervision over any attorney as I had prior to the assignment to welfare fraud.
>
> As part of my assignment to welfare fraud during Summer of 2009, I was

---

[3]    Ms. Jones was appointed to the bench in August 2008.

4

physically moved out of the District Attorney's office to a building approximately a mile from the courthouse.  This required that I load up my files every day I went to court, drive to the courthouse, find parking, unload my car, and take the files from my car to the courthouse.  During this time, I had a condition with my ankle that made walking painful.

Mr. Keitz testified as to his reasons to reassign Ms. Mitchell:

A.      I had different objectives.  One is the primary objective is that Karen was hostile to me.  Karen was exhibiting a demeanor that the other attorneys in the office were following. . . . she was not supporting me and I felt that other people in the office were taking her lead.  And I wanted to furthermore try and bring in somebody to help take – put back as a permanent position for the welfare fraud prosecution assignment in that officer over there.

Q.      So part of your reason for assigning Karen Mitchell to the welfare fraud office was your desire to remove her from the main District Attorney's office where most of the district attorneys were located, correct?

A.      Yes.

Ms. Mitchell notes that the DDA assigned to welfare fraud prior to her reassignment had an office in the main District Attorney's office and that Ms. Mitchell was the last attorney assigned to welfare fraud who worked out of the welfare fraud office.

Mr. Keitz was concerned about of perception that Ms. Mitchell ran the DA's office:

Q.      You were concerned that people in the office might view Karen as being the district attorney; is that right?

A.      As running the office.

Q.      And you did not want people in the office thinking that Karen was running the office, right?

A.      I saw it in the expressions and the mannerisms of the attorneys in the office.

Q.      And what was it in the expressions and mannerisms of attorneys in the office that led you to believe that they thought Karen was running the office?

A.      Well, for instance, if we had an attorney meeting and I put something out there, everybody would look at Karen before they would respond and Karen would, you know, roll her eyes, snort, sniffle, you know, whatever.

          . . .

Q.      Yeah.  When you were doing attorney meetings and you saw this experience, did you reflect on the fact that Karen had greater support among the district attorneys in the office for her elevation to district attorney than you had?

A.      Yes.

5

1    Q.    And was that a matter of concern for you, correct?

2    A.    Yes.

3    Ms. Mitchell declares that the effects of her reassignment to welfare fraud were to "narrow focus

4    of my assignment" in that she did not "provide advice on search and seizure and development of

5    evidence to local law enforcement," "did not handle difficult and specialized legal assignments," "did

6    not direct investigations of law enforcement officers, except welfare investigators," and "effectively

7    ceased consulting with other District Attorney staff or advising law enforcement."

8    Ms. Mitchell declares that "Mr. Keitz stopped me from doing any training for the office."  Mr.

9    Keitz testified that with Ms. Mitchell's reassignment to welfare fraud, "[s]he was going to be the welfare

10   fraud attorney so she would not supervise any attorneys in the welfare fraud department" but would have

11   additional investigators pulled from other areas of the DA's office.  Mr. Keitz reassigned office staff

12   supervision for which Ms. Mitchell was responsible previously and assigned her no budget work in that

13   he took primary responsibility for the DA's office budget.

14                        **Ms. Mitchell's Support For Mr. Keitz' Rival**

15   During September 2009 to March 2010, Ms. Mitchell publicly supported Bob McGurty ("Mr.

16   McGurty") to succeed Mr. Keitz as District Attorney.  Ms. Mitchell spoke publicly to support Mr.

17   McGurty and attended public functions where she "could be seen as supporting McGurty." Ms. Mitchell

18   declares that Mr. Keitz "was aware of McGurty's candidacy, saw me at functions where I was supporting

19   McGurty."

20   County ordinances regulate County officer and employee "political activities" and prohibit

21   "political activities" during working hours, on County property, or with the use of County property.  Ms.

22   Mitchell declares that she did not engage in prohibited political activities.

23                              **Ms. Mitchell's Resignation**

24   Ms. Mitchell had foot surgery in spring 2010 and declares that she was unable to drive when she

25   attempted to return to work.  Ms. Mitchell further declares that her request to return to the main District

26   Attorney's office was refused although offices were available.  Ms. Mitchell claims that in the absence

27   of County income, she resigned.

28   / / /

6

**Ms. Mitchell's Claims**

Ms. Mitchell proceeds on her Complaint ("complaint") to allege that after his appointment, Mr. Keitz stigmatized Ms. Mitchell and reassigned her from a courtroom with "full responsibilities for all cases" to welfare fraud.  The complaint alleges that Ms. Mitchell "was physically moved out of" the DA's office "to an annex building that no Deputy District Attorney has occupied for years."  The complaint characterizes the move as "retaliatory, inasmuch as Mitchell [sic] physical condition restricts her mobility and she was required to walk and transport exhibits and document files into the Courthouse."

The complaint alleges that after Ms. Mitchell's late 2009 public support of Mr. Keitz' potential opponent, Mr. Keitz "continued his adverse employment actions against Mitchell."  The complaint alleges that Ms. Mitchell's Achilles tendon transplant in spring 2010 restricted her mobility and required her to wear a walking boot.  The complaint alleges that defendants refused to accommodate Ms. Mitchell and that she "was forced to file for retirement" after her sick and vacation pay and disability insurance expired.

The complaint's (first) section 1983 First Amendment retaliation claim alleges that in 2008 and 2009, Ms. Mitchell "spoke out on matters of public interest relative to her interview before the County's Board of Supervisors and when she sought appointment to the position of District Attorney."  The claim further alleges that defendants "have retaliated against Mitchell" "pursuant to a custom, practice or policy established by Keitz as District Attorney and therefore the person who acted as the final policymaker with respect to the employment actions taken against Mitchell."

The complaint also alleges discrimination, retaliation, hostile environment and failure to accommodate claims under the California Fair Employment and Housing Act ("FEHA"), Cal. Gov. Code, §§ 12900, et seq., and the California Family Rights Act, Cal. Gov. Code, §12945.2.  Defendants do not directly challenge the complaint's California statutory claims but request that this Court decline to exercise supplemental jurisdiction over them if granted summary judgment on Ms. Mitchell's First Amendment retaliation claim.

The complaint seeks recovery for Ms. Mitchell's financial loss, emotional distress and attorney fees.

**DISCUSSION**

**Summary Judgment Standards**

The gist of defendants' summary judgment motion is that Ms. Mitchell's First Amendment retaliation claim fails because she "was a policymaker with the District Attorney's office" and thus subject to partisan political action.  The gist of Ms. Mitchell's opposition was that she was never a policymaker, especially after her reassignment to welfare fraud.

F.R.Civ.P. 56(a) permits a party to seek summary judgment "identifying each claim or defense – or the part of each claim or defense – on which summary judgment is sought."  "A district court may dispose of a particular claim or defense by summary judgment when one of the parties is entitled to judgment as a matter of law on that claim or defense." *Beal Bank, SSB v. Pittorino*, 177 F.3d 65, 68 (1st Cir. 1999).

Summary judgment is appropriate when the movant shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." F.R.Civ.P. 56(a); *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356 (1986); *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).  The purpose of summary judgment is to "pierce the pleadings and assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec.,* 475 U.S. at 586, n. 11, 106 S.Ct. 1348; *International Union of Bricklayers v. Martin Jaska, Inc.*, 752 F.2d 1401, 1405 (9th Cir. 1985).

On summary judgment, a court must decide whether there is a "genuine issue as to any material fact," not weigh the evidence or determine the truth of contested matters.  F.R.Civ.P. 56(a), (c); *Covey v. Hollydale Mobilehome Estates*, 116 F.3d 830, 834 (9th Cir. 1997); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598 (1970); *Poller v. Columbia Broadcast System*, 368 U.S. 464, 467, 82 S.Ct. 486 (1962); *Loehr v. Ventura County Community College Dist.*, 743 F.2d 1310, 1313 (9th Cir. 1984).  "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505 (1986)

The evidence of the party opposing summary judgment is to be believed and all reasonable

inferences that may be drawn from the facts before the court must be drawn in favor of the opposing party. *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505; *Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348.  The inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-252, 106 S.Ct. 2505.

To carry its burden of production on summary judgment, a moving party "must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000); *see Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (2007) (moving party is able to prevail "by pointing out that there is an absence of evidence to support the nonmoving party's case"); *High Tech Gays v. Defense Indus. Sec. Clearance Office*, 895 F.2d 563, 574 (9th Cir. 1990).  A "complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial" to entitle the moving party to summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548 (1986).

"[T]o carry its ultimate burden of persuasion on the motion, the moving party must persuade the court that there is no genuine issue of material fact." *Nissan Fire*, 210 F.3d at 1102; *see High Tech Gays*, 895 F.2d at 574.  "As to materiality, the substantive law will identify which facts are material.  Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505.

"If a moving party fails to carry its initial burden of production, the nonmoving party has no obligation to produce anything, even if the nonmoving party would have the ultimate burden of persuasion at trial." *Nissan Fire*, 210 F.3d at 1102-1103; *see Adickes*, 398 U.S. at 160, 90 S.Ct. 1598.  "If, however, a moving party carries its burden of production, the nonmoving party must produce evidence to support its claim or defense." *Nissan Fire*, 210 F.3d at 1103; *see High Tech Gays*, 895 F.2d at 574.  "If the nonmoving party fails to produce enough evidence to create a genuine issue of material fact, the moving party wins the motion for summary judgment." *Nissan Fire*, 210 F.3d at 1103; *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548 (1986) (F.R.Civ.P. 56 "mandates the entry

1  of summary judgment, after adequate time for discovery and upon motion, against a party who fails to

2  make the showing sufficient to establish the existence of an element essential to that party's case, and

3  on which that party will bear the burden of proof at trial.")

4      "But if the nonmoving party produces enough evidence to create a genuine issue of material fact,

5  the nonmoving party defeats the motion." *Nissan Fire*, 210 F.3d at 1103; *see Celotex*, 477 U.S. at 322,

6  106 S.Ct. 2548. "The amount of evidence necessary to raise a genuine issue of material fact is enough

7  'to require a jury or judge to resolve the parties' differing versions of the truth at trial.'" *Aydin Corp.*

8  *v. Loral Corp.*, 718 F.2d 897, 902 (quoting *First Nat'l Bank v. Cities Service Co.*, 391 U.S. 253, 288-

9  289, 88 S.Ct. 1575, 1592 (1968)). "The mere existence of a scintilla of evidence in support of the

10  plaintiff's position will be insufficient." *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505.

11      As discussed below, Ms. Mitchell raises sufficient factual issues whether she qualifies as a

12  policymaker.

13  **First Amendment Protection – Policymaker Exception**

14      Ms. Mitchell notes that public employees may not be disciplined for mere exercise of First

15  Amendment rights. "A State may not condition public employment on an employee's exercise of his or

16  her First Amendment rights." *O'Hare Truck Service, Inc. v. City of Northlake*, 518 U.S. 712, 717, 116

17  S.Ct. 2353 (1996). "The First Amendment prevents the government, except in the most compelling

18  circumstances, from wielding its power to interfere with its employees' freedom to believe and associate,

19  or to not believe and not associate." *Rutan v. Republican Party of Illinois*, 497 U.S. 62, 76, 110 S.Ct.

20  2729 (1990). "Absent some reasonably appropriate requirement, government may not make public

21  employment subject to the express condition of political beliefs or prescribed expression." *O'Hare*

22  *Truck Service*, 518 U.S. at 717, 116 S.Ct. 2353.

23      Nonetheless, "an employee's rights are not absolute and must be balanced against the role of

24  government as an employer." *DiRuzza v. County of Tehama*, 206 F.3d 1304, 1308 (9th Cir.), *cert.*

25  *denied*, 531 U.S. 1035, 121 S.Ct. 624 (2000). "The problem in any case is to arrive at a balance between

26  the interests of the [employee], as a citizen, in commenting upon matters of public concern and the

27  interest of the State, as an employer, in promoting the efficiency of the public services it performs

28  through its employees." *Pickering v. Board of Ed. of Tp. High School Dist. 205, Will County*, 391 U.S.

563, 568, 88 S.Ct. 1731 (1968).  "Recognizing that there are some circumstances in which an employee's First Amendment rights are not absolute, the Supreme Court has carved out a narrow exception to the First Amendment's protection in cases where the public employee is a policymaker or confidential employee."  *DiRuzza*, 206 F.3d at 1308; *see Elrod v. Burns*, 427 U.S. 347, 367-368, 96 S.Ct. 2673 (1976) (recognizing an exception for "policymaking positions" where "the employee acts as an adviser or formulates plans for the implementation of broad goals").

The "term policymaker as used in this context does not mean 'one who makes policy.'  Rather, the term refers to a position in which political considerations are 'appropriate requirement[s] for the effective performance of the public office involved.'"  *Fazio v. City and County of San Francisco*, 125 F.3d 1328, 1333 (9th Cir. 1997) (quoting *Branti v. Finkel*, 445 U.S. 507, 519, 100 S.Ct. 1287 (9th Cir. 1997)).  In *Bardzik v. County of Orange*, 635 F.3d 1138, 1144 (9th Cir. 2011), the Ninth Circuit Court of Appeals recently explained government employee First Amendment protections and the "policymaker exception":

> The First Amendment protects the rights of citizens to criticize a government official, to support a candidate opposing an elected official, or to run against an elected official. *See Branti*, 445 U.S. at 513–17, 100 S.Ct. 1287. A citizen does not check these rights at the door when he accepts a government job. *See id.* Ordinarily, an elected official cannot fire or retaliate against an employee for his political opinions, memberships, or activities. *See id.*

> Nonetheless, this general rule has some limitations. In *Elrod* and *Branti*, the Supreme Court created the "policymaker exception," recognizing that an elected official must be able to appoint some high-level, personally and politically loyal officials who will help him implement the policies that the public voted for. *See Branti*, 445 U.S. at 517–20, 100 S.Ct. 1287; *Elrod v. Burns*, 427 U.S. 347, 367, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) (plurality op.) . . . An elected official may dismiss these same policymaking employees if they are no longer loyal, if they oppose his re-election, or simply if the official would prefer to work with someone else. "If [an official is] a policymaker, then under *Branti* his government employment could be terminated for purely political reasons without offending the First Amendment." *Fazio v. City of S.F.*, 125 F.3d 1328, 1332 (9th Cir.1997). We have recognized specifically that the rationale allowing for the patronage dismissal of a policymaker also justifies his dismissal for opposing the employer in an election. *Id.* at 1331–32.

Defendants identify the key issue as whether Ms. Mitchell was a policymaker.  The Ninth Circuit has listed "some" factors to identify a policymaking position: "vague or broad responsibilities, relative pay, technical competence, power to control others, authority to speak in the name of policymakers, public perception, influence on programs, contact with elected officials, and responsiveness to partisan

1  politics and political leaders." *Bardzik*, 635 F.3d at 1145 (citing *Fazio*, 125 F.3d at 1334 n. 5).

2       Determination whether particular duties qualify as a policymaker is "a question of law for the

3  district court—not the jury." *Bardzik*, 635 F.3d at 1145. "If a plaintiff is a policymaker, the court will

4  not consider the plaintiff's claim that under *Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct.

5  1731, 20 L.Ed.2d 811 (1968), the plaintiff's 'interest in free speech outweighs the [defendants'] interest

6  in running an efficient office.' . . . A plaintiff's status as a policymaker is dispositive." *Bardzik*, 635 F.3d

7  at 1151 (citation and footnote omitted).

8       Nonetheless, the policymaker "analysis is not intended to be formalistic." *Walker v. City of*

9  *Lakewood*, 272 F.3d 1114, 1132 (9th Cir. 2001), *cert. denied*, 535 U.S. 1017, 122 S.Ct. 1607 (2002).

10 The "essential inquiry is 'not whether the label "policymaker" or "confidential" fits a particular position;

11 rather the question is whether the hiring authority can demonstrate that party affiliation is an appropriate

12 requirement for the effective performance of the public office involved.'" *Fazio,*125 F.3d at 1331

13 (quoting *Branti*, 445 U.S. at 518, 100 S.Ct. 1287)).

14      Defendants argue that analysis of the nine *Bardzik* factors demonstrates that Ms. Mitchell is a

15 policymaker.  Ms. Mitchell responds that the basis for the policymaker exception to limit First

16 Amendment protection is "enchanc[ing] the public interest in effective government."  Ms. Mitchell

17 argues that Mr. Keitz' conduct reveals that she is not a policymaker because the results of his conduct

18 made the DA's office less efficient to render the nine *Bardzik* factors less relevant.  As such, this Court

19 will next turn to Ms. Mitchell's points that she is not a policymaker and then review the nine *Bardzik*

20 factors.

21                        **Civil Service Protection And Effective Demotion**

22      Ms. Mitchell notes that the County "enacted a Civil Service System for its regular employees"to

23 promote efficiency. Ms. Mitchell points to civil system purposes "to abolish the so-called spoils system,

24 and to increase the efficiency of the service by assuring the employees of continuance in office regardless

25 of what party may then be in power. Efficiency is secured by the knowledge on the part of the employee

26 that promotion to higher positions when vacancies occur will be the reward of faithful and honest

27 service." *Santa Monica Mun. Employees Assn. v. City of Santa Monica*, 191 Cal.App.3d 1538, 1545-

28 1546, 237 Cal.Rptr. 185 (1987). "The civil service system rests on the principle of application of the

1   merit system instead of the spoils system in the matter of appointment and tenure of office." *Hanley v.*

2   *Murphy*, 40 Cal.2d 572, 577, 255 P.2d 1 (1953).

3        Ms. Mitchell argues that an employee protected by civil service promotes government efficiency

4   due to "paying attention only to the merits of the employee's job performance, rather than by adhering

5   to the spoils system or a nebulous idea of 'political affinity.'" Ms. Mitchell continues that "[b]ecause

6   the policy rationale of the 'policymaker exception' is based on the public interest in effective

7   government, the policymaker exception cannot be extended to situations where patronage makes the

8   workplace less efficient." Ms. Mitchell argues that consistent with the policymaker exception, an

9   employee may not be retained and retaliated against because doing so renders a government office less

10  efficient. *See Wallace v. Benware*, 67 F.3d 655, 663 (7th Cir. 1995) ("We refuse to expand the scope of

11  the policymaker exception to cover conduct inimical to its purpose simply to circumvent the decision

12  of a particular locale to protect its deputy sheriffs from summary dismissal either under the terms of a

13  collective bargaining agreement or a legislative ordinance.")

14       Ms. Mitchell contends that as an SDDA, she did not qualify as an "assistant department head,"

15  a position outside of the County's civil service rules. As such, Ms. Mitchell argues she is subject to civil

16  service protections and not subject to "at will" termination. Ms. Mitchell points to DA LiCalsi's

17  "conscious decision" not to promote her to ADA to insulate her from demotion or termination.

18       Ms. Mitchell argues that Mr. Keitz effectively demoted her to a DDA and limited to her SDDA

19  role, "which Keitz viewed as not having an office-wide responsibility, or any involvement outside of the

20  supervisional responsibility she had for the attorneys that were assigned to her." Ms. Mitchell notes that

21  after she was reassigned to welfare fraud, she "stopped having any supervisorial responsibility for any

22  attorney," "stopped training, evaluating or directing any employee," and "ceased consult with other

23  District Attorney Staff, advice local law enforcement or direct investigation by law enforcement

24  officials."

25       Defendants argue that civil service protection does not change Ms. Mitchell's "status as a

26  policymaker subject to partisan dismissal or demotion." Defendants characterize "civil service

27  protection as a single factor to be considered in the policymaking analysis." Defendants fault Ms.

28  Mitchell's failure to cite "to any case stating that civil service protection exempts an employee from

13

1   partisan dismissal if employed as a policymaker."

2       In essence, Ms. Mitchell argues that:

3       1.   She is not a policymaker because she was entitled to civil service protection, to which

4           a policymaker would not enjoy; and

5       2.   Defendants are unable to characterize her as a policymaker to justify their retaliation

6           against her, especially given that Mr. Keitz effectively stripped any duties that would

7           nudge her toward a policymaker.

8   At a minimum, Ms. Mitchell has raised factual issues whether she was a policymaker.  The record

9   reflects that the DA's office was relatively small and that DA LiCalsi tasked SDDAs, including Ms.

10  Mitchell, with management-like tasks such as those that an ADA may perform.  However, the record

11  is clear the Ms. Mitchell did not monopolize such functions which were distributed among the three

12  SDDAs during DA LiCalsi's tenure.  Based on the record, Ms. Mitchell's multiple responsibilities and

13  perceived talents under DA LiCalsi do not qualify her a policymaker given how DA LiCalsi ran the

14  DA's office.  In addition, Ms. Mitchell's civil service protection serves to negate policymaker status.

15

16      Moreover, the record reflects that Ms. Mitchell did not exercise policymaker functions under Mr.

17  Keitz.  Although she was responsible for welfare fraud, the universe of her responsibilities shrunk

18  dramatically, especially given her isolation from the main DA's office, lack of meaningful supervision,

19  and limited case assignments.  Nothing demonstrates that Ms. Mitchell continued to perform duties vital

20  to the overall effectiveness of the DA's office after her reassignment.

21      Next, this Court will address the nine *Bardzik* factors and defendants' assertion that Ms. Mitchell

22  "is a policymaker if Defendants can show she met five of the nine factors."

23                          **Vague Or Broad Responsibilities**

24      Defendants characterize Ms. Mitchell's responsibilities as broad.  Ms. Mitchell responds that the

25  County's job description for SDDAs were clear and that DA LiCalsi's additional assignments were

26  "clearly delineated and given on a situation by situation basis."

27      DA LiCalsi hired Ms. Mitchell for the newly created SDDA position.  DA LiCalsi described Ms.

28  Mitchell as "one of my right hand people."  DA LiCalsi relied on Ms. Mitchell for "administrative

14

tasks," including placing her "in charge of trying to increase the productivity of our intake system" and "responsibilities to be the liaison for certain agencies," including the Madera Police Department.

Ms. Mitchell testified that as one of DA LiCalsi's SDDAs, "we would be his next in line running the office. He expected us to be the people that the people underneath us would go to . . . . That instead of having an Assistant D.A. he had the three of us as that bumper between all the attorneys, issues, problems, questions, complaints. That they would go to us instead of directly to him . . . we would be more the people running, making the decisions . . ."

When asked to describe her administrative duties on her return as a SSDA, Ms. Mitchell explained:

> . . . there wasn't a list of do this, do this. He would give me things that he normally did . . . I would go to meetings in his stead, writing up things for the Board, working on various grants, language, composing things for him, meeting with Assistant D.A.s in other counties. . . . Helping him with the budget, taking care of the training of the deputies to schedule their seminars and such to make sure we stayed within the budget to help them decide how many we should ask for each year. . . . I would monitor the training of each deputy to have them comply with their MCLE requirements . . .

> . . . Some of it structured, the training and some of the budgetary items. Some of it just, here's the meeting, can you go to it, things administrative that he didn't have the time nor inclination to perhaps do.

Ms. Mitchell described her budget work as follows:

> Mainly worked on certain aspects of the budget that he gave me annually. For instance, the training budget, since I pretty much controlled that within the attorneys, so recommending what it should be and justifying why we would need a change or increase. . . .

> . . . It was more that I did the supplies, the training, certain subsections of that, because I was responsible for getting the reference materials, the books and such for attorneys so I knew how much I would need to spend on that.

Ms. Mitchell testified that she "supervised the clerical and the investigators, and along with doing all my other assignments in court and other prosecutions and such that I did." Ms. Mitchell equated her work, during the last year of DA LiCalsi's tenure, to that of an ADA. Ms. Mitchell testified that through the end of 2008, her supervisory responsibilities and other tasks qualified her as an ADA.

Ms. Mitchell believed that DA LiCalsi "considered me a go-to person for difficult issues or personnel issues or cases" and gave her "additional duties that were above and beyond what the other supervisors did." In addition, DA LiCalsi "put her in charge of parole hearings and so she would have

15

1  to go to the parole hearings that we determined were the most significant."

2  Defendants conclude that the broad job duties factor weighs in their favor in that Ms. Mitchell

3  "was responsible for a broad variety of tasks . . . ranging from working on portions of the office budget,

4  to supervising clerical staff, to interviewing applicants and making recommendations on hiring."

5  The record indicates that Ms. Mitchell had broad duties. However, such duties are a product of

6  the size of the DA's office and DA LiCalsi's management of it. Ms. Mitchell's work reflects that of a

7  SDDA with sporadic additional duties incumbent of the DA's office. Defendants fail to demonstrate

8  that Ms. Mitchell multiple SDDA duties qualify her as an ADA.

9  **Compensation**

10  Defendants argue that Ms. Mitchell's status as "one of the highest paid attorneys" in the DA's

11  office demonstrates that she was a policymaker. Ms. Mitchell responds that "supervisors are paid more

12  than the supervised."

13  When DA LiCalsi recruited Ms. Mitchell to return to the DA's office, he offered her a raise

14  beyond her prior DA's office salary and her then current salary for her San Diego job. Defendants note

15  that prior to her 2002 departure from the DA's office, Ms. Mitchell received a five percent bonus as

16  acting supervisor. DA LiCalsi characterized Ms. Mitchell's pay when she returned to the DA's office

17  as "substantially more" than her pre-departure salary.

18  In December 2008, Ms. Mitchell's annual salary was $106,761.96, which exceeded Deputy

19  District Attorney I, II and III and Senior Deputy Attorney salaries by, in some cases, tens of thousands

20  of dollars. County Senior Personnel Analyst Susan Carter ("Ms. Carter") declares: "Only another

21  Supervising Deputy District Attorney or the District Attorney himself could have made more than Ms.

22  Mitchell in the Madera County District Attorney's office in 2008."

23  Defendants argue that Ms. Mitchell's salary, substantially more than the rank and file district

24  attorneys, demonstrates her status as a policymaker.

25  This Court disagrees with defendants. Ms. Mitchell's salary reflects that she was a supervising

26  manager and thus subject to higher salary than the rank and file. Defendants' slim analysis offers no

27  consideration of Ms. Mitchell's experience and skills compared to the rank and file attorneys in the DA's

28  office.

**Technical Competence**

Defendants argue that Ms. Mitchell's SDDA position required "technical competence" which she handled to DA LiCalsi's satisfaction.  Ms. Mitchell faults defendants' failure to provide "any way of comparing Mitchell to the ADA position."

DA LiCalsi hired Ms. Mitchell as an SDDA because of her special skill set.   Ms. Mitchell became a "right hand" person for DA LiCalsi, who depended on her abilities and wide range of skills.  Under DA LiCalsi, Ms. Mitchell was the only DA's office attorney trained to handle sexually violent predator cases and assigned to work with the County Gang Task Force.  Ms. Mitchell was the only attorney, other that the District Attorney, to attend hearings for prisoners sentenced to life.  Ms. Mitchell prosecuted all child and infant homicides, sexual assault and domestic violence cases, and agricultural crimes.  Ms. Mitchell testified: "I did major cases, homicides, cases that I kind of picked because of their complexity and degree of difficulty, because I liked those."  Ms. Mitchell picked up "big" cases outside her assigned department.  Ms. Mitchell believed that DA LiCalsi found her service impeccable because "he would give me additional duties that were above and beyond what the other supervisors did."

Defendants argue that Ms. Mitchell's SDDA position required technical skill given "the myriad of assignments entrusted to her and to no other attorney."  Defendants point to Ms. Mitchell's "wide variety of other administrative tasks that required a special skill set" to demonstrate her policymaker status.

This Court is unpersuaded by defendants' attempt to equate policymaker technical competence based on Ms. Mitchell's professional skills which set her apart from her peers in the DA's office.  DA LiCalsi's reliance on Ms. Mitchell and assignment to her of select tasks does not translate to technical competence, especially considering the size and management of the DA's office.

**Power To Control Others**

Defendants argue that Ms. Mitchell had power to control others given her "authority to supervise and direct employees" in the DA's office to demonstrate that she was a policymaker.

DA LiCalsi hired Ms. Mitchell as an SDDA because he believed she has excellent supervisory skills and appreciated the "way she mentored younger Deputy D.A.s . . . the way she worked with law enforcement . . . supervised these officers, got them to do things the right way and trained them.  I felt

1    that she had some natural skill in that." In the DA's office, Ms. Mitchell was responsible to supervise

2    clerical staff and investigators.

3        DA LiCalsi testified that personnel issues were "part of her responsibilities." Ms. Mitchell

4    testified that she handled "any problems with the staff, which were many, constantly, because it was a,

5    what best might be called a dysfunctional family." DA LiCalsi testified that he told Ms. Mitchell "to

6    ride over [a DDA] to make sure she didn't go too far out of bounds and to basically ride her over to keep

7    her going in the right direction because she tended to be a loose cannon at times." Defendants attribute

8    Ms. Mitchell to have been involved in hiring and firing decisions along with the other SDDAs.

9        Ms. Mitchell was in charge of training for all attorneys in the DA's office. Ms. Mitchell testified

10   that she took "care of the training of the deputies to schedule their seminars and such to make sure we

11   stayed within the budget" and "would monitor the training of each deputy to have them comply with

12   their MCLE requirements." Ms. Mitchell ensured that each DA's office attorney attended at least one

13   seminar and that no one attended "too many trainings" due to budget constraints. Ms. Mitchell

14   monitored training attended by DA's office attorneys and which training they needed to attend. Ms.

15   Mitchell handled travel requests of DA's office attorneys in conjunction with her training

16   responsibilities. Ms. Mitchell assisted with MCLE training within the DA's office and obtained DA's

17   office accreditation to conduct training.

18       Defendants argue that through Ms. Mitchell's supervisory status, she controlled others, addressed

19   personnel issues and was responsible for DA's office training to enhance her policymaker status.

20       The record reflects that Ms. Mitchell was a supervising manager and that her ability to control

21   others was no more than any other SDDA. Ms. Mitchell supervised clerical staff and oversaw MCLE

22   training, but nothing suggests she exercised substantial control over the DA's office. There is no

23   evidence that she directed DDA assignments or case management, except perhaps to the limited extent

24   of those working directly with her. Moreover, Ms. Mitchell lost power to control attorneys with her

25   reassignment to welfare fraud. In the absence of more widespread control, Ms. Mitchell's supervisory

26   authority fails to translate to a policymaker.

27                        **Authority To Speak**

28       Defendants contend that Ms. Mitchell was authorized to speak in DA LiCalsi's name as an

elected official in that Ms. Mitchell attended meetings in his place and represented him on committees.

Ms. Mitchell testified: "I would go to meetings in his stead, writing up things for the Board, working on various grants, language, composing things for him, meeting with Assistant D.A.s in other counties." Ms. Mitchell further testified: "The Board called me once to go to some committee meeting or something that Ernie usually sat on, just anything that he would do, people called me to do because they knew, they just knew that I would, could do it." Ms. Mitchell testified that when DA LiCalsi was unavailable during his last days in the DA's office, "it was me that everyone came to and that – I had to fill in for him so that's what I mean by it became more. . . . It was just he wasn't there so naturally it was me."

Defendants argue that Ms. Mitchell's attendance at meetings and committees in place of DA LiCalsi shows that Ms. Mitchell "was authorized to speak on behalf of policymakers within the department" to support her policymaker status.

This Court disagrees with defendants. The record suggests that Ms. Mitchell sporadically sat in meetings for which DA LiCalsi was unavailable. The inferences from the evidence are that she was not primarily responsible to attend meetings which she attended only as needed. The record lacks evidence that Ms. Mitchell communicated openly and publicly on issues of DA's office policy and similar matters of importance.

**Public Perception**

Defendants contend that since Ms. Mitchell "was authorized to speak in the name of policymakers within the District Attorney's office, she was perceived by the public to be a policymaker." Ms. Mitchell notes the absence of evidence that "the public perceived Mitchell as a 'policymaker' in the District Attorney's office at any time."

In hiring Ms. Mitchell as an SDDA, DA LiCalsi pointed to "the way she worked with law enforcement, and basically, for lack of a better term, supervised these officers, got them to do things the right way and trained them." Ms. Mitchell testified that DA LiCalsi wanted her to "restore relationships with the law enforcement and with the media" when he hired her as an SDDA. Ms. Mitchell initiated a gang injunction with local law enforcement agencies. Ms. Mitchell developed a good relationship with a Fresno radio station news director.

19

1    Defendants argue that Ms. Mitchell qualifies as a policymaker given her close community work

2    outside the DA's office and responsibilities to improve relationships "within the community."

3    Defendants point to Ms. Mitchell's interaction with law enforcement.

4    The record reflects Ms. Mitchell's limited public outreach which fails to substantiate a public

5    perception that she was a policymaker.  Defendants merely to point to matters that correspond to Ms.

6    Mitchell's responsibilities as an SDDA, not a policymaker.

7                                    **Influence Over Programs**

8    Defendants contend that Ms. Mitchell had broad influence and job responsibilities in the DA's

9    office given her supervision of employees, direct training of attorneys, and management of portions of

10   the budget.  Ms. Mitchell faults defendants' failure to demonstrate her "substantial influence on the

11   District Attorney's policies."

12   Ms. Mitchell testified that she chiefly "worked on certain aspects of the budgets [DA LiCalsi]

13   gave me annually.  For instance, the training budget, since I pretty much controlled that with the

14   attorneys, so recommending what it should be and justifying why we would need a change or an

15   increase." Ms. Mitchell was responsible for "getting the reference materials, the books and such for the

16   attorneys" in conjunction with her training DA's office attorneys.  Ms. Mitchell monitored DA's office

17   attorney training and oversaw that attorneys attended required training.  Ms. Mitchell handled attorneys'

18   travel requests for training.  Ms. Mitchell spearheaded MCLE accreditation for the DA's office and

19   contributed to MCLE training within the DA's office.

20   Ms. Mitchell testified that she and her two fellow SDDAs were "next in line" to DA LiCalsi in

21   running the DA's office.  Ms. Mitchell characterized the SDDAs as a "bumper between all the attorneys,

22   issues, problems, questions, complaints.  That they would go to us instead of directly to him . . ." DA

23   LiCalsi tasked Ms. Mitchell with "trying to increase the productivity of [the] intake system" in the DA's

24   office.  In addition, Ms. Mitchell oversaw parole hearings and was a liaison for several agencies.

25   Defendants argue that Ms. Mitchell was a policymaker in that she exerted "broad influence over

26   many programs within the District Attorney's office" and DA LiCalsi "entrusted her with generating a

27   training program for the attorneys, increasing productivity, and initiating a gang injunction in addition

28   to her supervisory responsibilities."

1    Defendants point to Ms. Mitchell's influence over limited matters in a relatively small DA's

2    office.  Ms. Mitchell oversaw clerical staff and attorney training which, although important, do not

3    address the overall direction or philosophy of the DA's office.  Ms. Mitchell's responsibilities reflect

4    DA LiCalsi's management of the DA's office, not Ms. Mitchell's substantial influence on the DA's

5    office.

6                                **Contact With Elected Officials**

7    Defendants argue that Ms. Mitchell "had extensive contact" with DA LiCalsi and other elected

8    officials to further support her policymaker status.  Ms. Mitchell responds that her contacts with DA

9    LiCalsi were no more than those of "other members" of the DA's office.

10    Ms. Mitchell testified that she and the two other SDDAs were "next in line" to DA LiCalsi in

11   running the DA's office.  Ms. Mitchell testified that DA LiCalsi "expected us to be the people that the

12   people underneath us would go to . . . . That instead of having an Assistant D.A. he had the three of us

13   as that bumper between all the attorneys, issues, problems, questions, complaints."  Ms. Mitchell further

14   testified: "We all worked directly with Ernie [DA LiCalsi] because he was very hands-on as far as asking

15   questions and doing all of that, but it would be, the supervisors, the three of us, would be his right-hand

16   people so we would be the next level down from him so, yes, we would work closer with him."  Ms.

17   Mitchell noted that she and DA LiCalsi "considered me a go-to person for difficult issues or personnel

18   issues or cases.  He would bounce legal issues back and forth and I believe he thought highly of me

19   based on his actions toward me."

20    Defendants note that Ms. Mitchell had further contact with DA LiCalsi when he assisted to

21   obtain Ms. Mitchell's appointment as DA LiCalsi's replacement in that DA LiCalsi gave Ms. Mitchell

22   a copy of a letter he sent to the County's Board of Supervisors to support Ms. Mitchell's appointment.

23   Ms. Mitchell testified that to support her, DA LiCalsi "gave me some names of people in the community

24   that would be important for me to talk to, and sometimes he gave me their phone numbers."  Ms.

25   Mitchell further testified that she sought DA LiCalsi's help and "would ask him for a phone number for

26   a person or something."  Ms. Mitchell characterized DA LiCalsi as "a friend in that I could vent to him.

27   I could talk to him, I could talk to him about work or personal things."

28    Defendants point to the "volume of email communications" between DA LiCalsi and Ms.

1   Mitchell, including discussions on personnel and legal issues and strategy on Ms. Mitchell's attempts

2   for appointment as District Attorney, DA LiCalsi's offer to cover Ms. Mitchell's caseload, and Ms.

3   Mitchell's thoughts on organization of the DA's office.

4        Ms. Mitchell testified that she "had a good rapport" with County Superior Court judges two of

5   whom "called me and told me to come so I could talk to them about something that was happening. .

6   . . Mr. LiCalsi asked me to go and handle a situation for a judge who was having a problem with an

7   attorney." Ms. Mitchell also testified that "if an employee was not doing some thing or doing something

8   a judge did not like . . . they would tell me . . ."

9        Defendants conclude that Ms. Mitchell's extensive contact with DA LiCalsi and elected County

10  Superior Court judges qualified her as a policymaker.

11       Frequent, substantial contacts between DA LiCalsi and Ms. Mitchell were expected given that

12  Ms. Mitchell was an SDDA directly below DA LiCalsi. The inferences from the record suggest their

13  close working relationship, no different than that of District Attorney and SDDA in a small DA's office.

14  Ms. Mitchell's contacts with Superior Court Judges reflect her position and role in the DA's office as

15  an SDDA, not a policymaker. There is no evidence that Ms. Mitchell met with public officials to

16  address DA's office policy, procedures or philosophy.

17                    **Responsiveness To Partisan Politics And Political Leaders**

18       Defendants argue that Ms. Mitchell was responsive to political leaders in that she "was hired

19  specifically to be a high-ranking employee" in the DA's office under DA LiCalsi and was demoted when

20  Mr. Keitz was appointed District Attorney. Defendants note that Ms. Mitchell's responsibilities changed

21  with the "political tides." Ms. Mitchell faults the absence of evidence that her SDDA position "required

22  her to be responsive to partisan politics and political leaders."

23       DA LiCalsi hired Ms. Mitchell as a then newly created SDDA. DA LiCalsi characterized Ms.

24  Mitchell as one of his "right hand people." Ms. Mitchell testified that in January 2009, after Mr. Keitz

25  became District Attorney, he started taking away Ms. Mitchell's authority, including that for a gang

26  injunction and handling attorney travel requests.

27       The record does not suggest that Ms. Mitchell was responsive to partisan politics or political

28  leaders. The record merely reflects that Mr. Keitz reassigned her to welfare fraud and limited or

1  removed her prior responsibilities based on his perception of her "running" the management of the DA's

2  office, not its policy.

3      In short, evaluation of the *Bardzik* factors supports no less than factual issues whether Ms.

4  Mitchell was a policymaker.

5  ### The County's Liability

6      Defendants argue that the complaint's First Amendment retaliation claim against the County is

7  predicated on Mr. Keitz' alleged wrongs and that since Mr. Keitz is subject to immunity for the claim,

8  the claim fails as to the County.  As demonstrated above, defendants fail to eliminate factual issues as

9  to Ms. Mitchell's policymaker status to relieve the County of liability.

10  ### Supplemental Jurisdiction

11      Defendants urge this Court to decline to exercise supplemental jurisdiction over the complaint's

12  FEHA claims if summary judgment is granted on the First Amendment retaliation claim.  In the absence

13  of summary judgment for defendants, this Court need not address supplemental jurisdiction.

14  ### CONCLUSION AND ORDER

15      For the reasons discussed above, this Court:

16  1.      DENIES defendants summary judgment; and

17  2.      RECONFIRMS the November 30, 2011 pretrial conference and January 17, 2012 trial.

18      IT IS SO ORDERED.

19  **Dated:   October 14, 2011**                    **/s/ Lawrence J. O'Neill**
                                    UNITED STATES DISTRICT JUDGE

23